# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF GEORGIA

# SAVANNAH DIVISION

| | | |
|---|---|---|
| TRACY LEA FORTSON, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No. CV410-217 |
| | ) | |
| BELINDA DAVIS, Warden, | ) | |
| | ) | |
| Respondent. | ) | |

## REPORT AND RECOMMENDATION

While Douglas Benton slept on a couch in his home, Tracy Lea Fortson pressed her gun to his head, pulled the trigger, and killed him. *Fortson v. State*, 280 Ga. 376, 376-77 (2006); doc. 17-5 at 96.[1] She wrapped his body in shower curtains, placed it in a camouflage-painted horse-feeding trough, mixed in concrete, and hid it in a local game preserve. *Fortson*, 280 Ga. at 376-77. Next she tried to burn his house, "apparently to hide evidence of the murder." *Id.* That effort failed, the "trough tomb" was later found, and on mostly circumstantial and expert-

---

[1] All documents referenced here have been "E-filed." The Court is thus using the electronic screen page inserted onto the top of each page by the Court's CM/ECF software.

witness evidence she was convicted and sentenced to life plus ten years for malice murder and attempted arson. *Fortson*, 280 Ga. at 376-77.[2]

Following her direct and collateral appeals, she filed her 28 U.S.C. § 2254 petition here. Doc. 1. Nearly all of her claims turn on her insistence that her retained attorney, who represented her at trial and on direct appeal, provided her with ineffective assistance of counsel (IAC). *Id.* at 23-28 ¶¶ 1-34, 36-47, 49, 51; *see also* doc. 14; doc. 15-3 at 66. Her petition should be denied.

---

[2] *Fortson* supplies additional procedural history:

Benton was killed on or about June 4, 2000. On October 18, 2000, a Madison County grand jury indicted Fortson for malice murder, felony murder while in the commission of aggravated assault by shooting Benton, aggravated assault by shooting Benton, aggravated assault by stabbing Benton, and attempted arson. Fortson was found guilty of all charges, but her convictions were reversed in *Fortson v. State*, 277 Ga. 164, 587 S.E.2d 39 (2003). After a change of venue, Fortson was tried before a jury in Effingham County March 22-25, 2004, and found guilty of malice murder, felony murder in the commission of aggravated assault by shooting Benton, aggravated assault by shooting Benton, and attempted arson; she was found not guilty of aggravated assault by stabbing Benton. On April 5, 2004, Fortson was sentenced to life in prison for malice murder, and a consecutive term of ten years in prison for attempted arson; the aggravated assault merged with the malice murder conviction, and the felony murder stood vacated by operation of law. *See Malcolm v. State*, 263 Ga. 369, 372-374(4), (5), 434 S.E.2d 479 (1993). Fortson moved for a new trial on April 20, 2004, and amended her motion on September 9, 2004. The trial court denied the motion on April 14, 2005.

*Fortson*, 280 Ga. at 376.

# I. GOVERNING STANDARDS

In both her direct and collateral appeals the Georgia courts issued written opinions. Rulings on fully adjudicated issues must "be given the benefit of the doubt," *Felkner v. Jackson*, ___ U.S. ___, 131 S. Ct. 1305, 1307 (2011) (quotes and cite omitted), which means this Court cannot disturb them unless they

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, *as determined by the Supreme Court*[3] of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (emphasis and footnote added).

This is a highly deferential, "difficult to meet" standard that petitioners must overcome. *Harrington v. Richter*, 562 U.S. ___, 131 S. Ct. 770, 786 (2011); *Cullen v. Pinholster*, ___ U.S. ___, 131 S. Ct. 1388, 1398 (2011). And "2254(d) applies even to summary state court opinions,

---

[3] "Clearly established" means a Supreme Court holding, not dicta, and a holding that exists at the time of the state court decision that applies the legal principle at issue. *Cullen v. Pinholster*, ___ U.S. ___, 131 S. Ct. 1388, 1399 (2011); *Thaler v. Haynes*, ___ U.S. ___, 130 S. Ct. 1171, 1173 (2010); *Bowles v. Sec'y for Dep't of Corrs.*, 608 F.3d 1313, 1315 (11th Cir. 2010). Lower court opinions, even if directly on point, will not suffice. *Bowles*, 608 F.3d at 1316.

as well as to opinions that do not cite Supreme Court precedent." *Means v. Sec'y, Dep't of Corrs.*, 2011 WL 2693204 at * 1 (11th Cir. Jul. 12, 2011) (citing *Harrington,* 131 S. Ct. at 784). So if a state court's decision is unaccompanied by any legal analysis or explanation, the petitioner must still show that there was no reasonable basis for the state court to deny relief. *Johnson v. Sec'y, Dep't of Corrs.*, 643 F.3d 907, 930 n. 9 (11th Cir. 2011).[4]

---

[4]    Essentially, petitioners must reverse engineer adverse state court rulings, i.e., come up with all the ways such rulings *could* be legally supported, then knock each one down.

> Under § 2254(d), a [federal] habeas court must determine what arguments or theories supported or, as here, *could have supported*, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court.

*Harrington*, 131 S. Ct. at 786 (emphasis added); *Amos v. Thornton*, 646 F.3d 199, 205 (5th Cir. 2011) ("Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief. To assess whether a petitioner has made this showing, we determine what arguments or theories *could have* supported the state court's decision and then ask whether fairminded jurists could conclude that those arguments and theories are consistent with the Supreme Court's relevant teachings.") (quotes, footnotes, and alterations omitted).

As a result of this dynamic, state attorneys who author state court opinions that are then signed unchanged (a not uncommon practice in this Court's experience) have little incentive to read, much less cite to, the record or even develop legal arguments -- federal judges will now do that even if the state court's decision is summary in nature or barren of any analysis whatsoever. As noted in *French v. Carter*, 2011 WL 2491595 at * 2 (S.D. Ga. Jun. 22, 2011), this reality emerges in IAC-based, habeas cases coming before this Court: short-shrifted, attorney-authored state habeas rulings and ensuing federal habeas briefs predominantly premised upon a

Finally, if "it is not clear whether deference applies, [the Court] may deny a § 2254 petition by reviewing the claim *de novo*, as the 'petitioner will not be entitled to a writ of habeas corpus if his or her claim is rejected on *de novo* review.' *Berghuis v. Thompkins*, ___ U.S. ___, 130 S. Ct. 2250, 2265 (2010)." *Green v. Sec'y, Fla. Dep't of Corrs.*, ___ F. App'x ___, 2011 WL 3360654 at * 1 (11th Cir. Aug. 3, 2011). This Court also must presume state court factual determinations to be correct; petitioners must rebut that presumption by clear and convincing evidence. 28 U.S .C. § 2254(e).

Ineffective assistance of counsel (IAC) claims, even when reviewed *de novo*, are subject to a standard that packs its own internal layer of deference. *Strickland v. Washington*, 466 U.S. 668 (1984). "[A] defendant must show both deficient performance by counsel and prejudice." *Knowles v. Mirzayance*, 556 U.S. ___, ___, 129 S. Ct. 1411, 1419 (2009). Thus, she must show that her lawyer's representation fell below an objective standard of reasonableness. *Strickland*, 466 U.S. at

---

simple declaration that there was no ineffective assistance because . . . counsel did not violate the *Strickland* standard. Put another way, "counsel was not ineffective because counsel was not ineffective."

This new deference dynamic is somewhat lost on Fortson, who on some claims has failed to reverse engineer the summary state habeas opinion entered against her.

688. Courts apply a "strong presumption" that counsel's representation was within the "wide range" of reasonable professional assistance. *Id*. at 689. *Strickland* error must be so serious "that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. at 687. On the prejudice prong the petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*.

"'Surmounting *Strickland*'s high bar is never an easy task,'" *Harrington*, 131 S. Ct. at 788 (quotes and cite omitted), and no hindsight or second-guessing is permitted. *Id*. But where a state court has already ruled on IAC claims, the petitioner's burden of

> [e]stablishing that [its] application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' *id*., at 689 [104 S. Ct. 2052]; *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7, 117 S. Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is '*doubly*' so, *Knowles*, 556 U.S., at ----, 129 S. Ct., at 1420. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at ---- [129 S. Ct., at 1420]. *Federal habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.*

*Id.* at 788 (emphasis added). Because this "[d]ouble deference is doubly difficult for a petitioner to overcome . . . it will be a rare case in which an ineffective assistance of counsel claim that was denied on the merits in state court is found to merit relief in a federal habeas proceeding." *Johnson*, 643 F.3d at 911; *Hamner v. Deputy Sec'y of the Fla. Dep't of Corrs.*, 2011 WL 3759812 * 4 (11th Cir. Aug. 25, 2011) ("Our standard of review is 'doubly deferential' when 'a *Strickland* claim [is] evaluated under the § 2254(d)(1) standard.'") (*quoting Knowles*, 129 S. Ct. at 1420).

Before the state court Fortson had to meet the *Strickland* standard by establishing both that (a) her counsel's performance was deficient in that "it fell below an objective standard of reasonableness," and (b) but for the attorney's errors, there is a reasonable probability that the result of the proceeding would have been different. *Harrington*, 131 S. Ct at 787. She thus was required to plead and prove that (a) counsel erred; (b) no reasonable lawyer would have done what her lawyer did; and (c) his act or omission was outcome-altering. *Borden v. Allen*, 646 F.3d 785, 822-23 (11th Cir. 2011) (IAC claim denied because petitioner failed to plead it with adequate specificity).

Before this Court, she must show that the state court's application of the *Strickland* standard was *"unreasonable"* which "is different from an *incorrect* application of federal law." *Harrington*, 131 S. Ct. at 785 (emphasis in original). Indeed, "even a strong case for relief does not mean the state court's contrary conclusion is unreasonable." *Id*. at 786. A state court's decision is unreasonable only if "there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents." *Harrington*, 131 S. Ct. at 786. In other words, if "there is any reasonable argument that counsel satisfied *Strickland's* deferential standard," federal habeas relief must be denied. *Id*. at 788; *Johnson*, 643 F.3d at 910-11.

## II. BACKGROUND

The state supreme court's *Fortson* decision supplies the facts supporting Fortson's conviction. The prosecution showed that

> [B]enton and Fortson had a romantic relationship that was "rocky." Benton was last seen by his neighbors on June 4, 2000. Fortson was seen at Benton's house that same day; she and Benton had been having difficulties in their relationship in the weeks before June 4, and had a serious argument on or about that date. On June 17, 2000, Benton's neighbors became concerned about his well-being; it appeared that exotic birds that he kept at his home had not been cared for. Law enforcement officers were called, entered Benton's home to ensure that he was not inside and in need of assistance, and exited when it was determined he was not

there. The officers treated Benton's disappearance as a missing person case.

*Fortson*, 280 Ga. at 377 (footnotes omitted).  Next, the state showed how the police connected Fortson to Benton's murder:

> On June 19, 2000, Benton's body was found on a cattle farm and game preserve in Oglethorpe County; Fortson had access to and knowledge of the farm from hunting there. The body was wrapped in two shower curtains; the shower curtain from Benton's bathroom was missing, and on June 4, 2000, Fortson purchased a shower curtain. In addition to being wrapped in the shower curtains, Benton's body was encased in concrete in a horse feeding trough; the trough had been painted in a camouflage pattern and placed in an obscure location on the farm.[5] On June 4, 2000, Fortson had also purchased a horse feeding trough and ten 80-pound bags of concrete mix. Samples of paint from spray paint cans found at Fortson's residence matched the composition of the paint on the trough. Recent scar marks on trees at the site where the trough was found matched marks on Fortson's pickup truck. Concrete in the bed of her truck had the same geologic origin as that in which Benton's body was encased.

*Id.* at 377 (footnotes added and omitted).  At trial, Fortson -- who had been a sheriff's deputy -- testified that on June 5, 2000, the trough and concrete mix were missing from her carport but she did not report them stolen to police.  *Id.* at 377 n. 2 & 3.  "Physical evidence showed that Benton had been shot in the head while he lay on his couch. Fortson

---

[5]  Employees from a local store testified that on June 4, 2000, Fortson had purchased "Sakrete" (a concrete mix) and a 2 x 2 x 6' water trough.  Doc. 17-5 at 12-13, 16, 20-21.

possessed ammunition of the same type as the fatal bullet, and a rifle that could have fired it." *Id.* at 377.[6] "The bullet was too distorted to allow any definitive match." *Id.* at 377 n. 4. The state adduced additional evidence linking Fortson to the crime:

> Early in June 2000, Benton's vehicle was left at the residence of a friend; a note, purportedly signed by Benton, was affixed to the windshield. The handwritten note stated that Benton would be out of town for a while and asked his friend to take care of his truck; the note also asked the friend to try to hide the truck, not to try to call Benton, and "don't say anything to nobody." The friend had "really never looked" at Benton's handwriting before.[7] An expert witness opined that the note had been written by Fortson. The note was taped to the windshield with special tape of the type used to lift latent fingerprints; Fortson had been issued such tape when she was employed as a deputy sheriff. The tape showed that it had been handled by someone wearing latex gloves, and a bloodstained fingerprint inside Benton's home also showed evidence of having been made by one wearing latex gloves. Latex gloves were found in Fortson's home.

> At trial, Fortson testified that Benton had been involved in the prosecution of a drug dealer, and that she had told police officers investigating his death that fact. However, one of the investigators

---

[6] A forensic pathologist autopsied Benton's body and opined that "the cause of death was due to the combined effects of multiple stab wounds and gunshot to the head." Doc. 17-5 at 83, 99; *see also id.* at 106 (conceding on cross that the gunshot alone was enough to cause death). As noted *supra*, the jury acquitted Fortson of aggravated assault by stabbing Benton. *Fortson,* 280 Ga. at 376.

[7] The friend, who said he'd known Benton since 1990, testified that when he first looked at the note "I thought it was Doug's handwriting. I had really never looked at Doug's handwriting but we had always been kidding around about our Japanese handwriting because we both wrote pretty rough. Q. Being close friends with him from the time you were, you looked at the note and did it appear to be written by Doug? A. Yes sir." Doc. 17-5 at 24, 30-31; *see also* doc. 15-8 at 1 (copy of the note)

she named testified in rebuttal that she had not discussed with him any alleged role of Benton's in the drug dealer's prosecution. The investigator also testified that to his knowledge Benton had no role in that prosecution.

After Benton's body was found, there was an attempt to burn his house, apparently to hide evidence of the murder. On June 17, 2000, police officers first entered Benton's house. The next day, June 18, officers spoke with Fortson, and discussed the turbulent nature of her relationship with Benton. The next day, June 19, Benton's body was found, and officers again entered Benton's home, this time encountering the strong odor of kerosene and finding signs of an attempted arson; there had been no such odor two days before. The officers saw evidence that someone had attempted to clean bloodstains from the couch; the couch and adjacent carpet had been soaked with kerosene. Lit candles had been placed on the couch and carpet; the couch was the exact locale of the shooting.

*Id.* at 377-78. "The candles failed to ignite the kerosene." *Id.* at 378 n. 5. The evidence, concluded the *Fortson* court, "showed that the attempted arson was inextricably linked to the murder, and the jury was authorized to find beyond a reasonable doubt that Fortson was guilty of malice murder and attempted arson, *see Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L.Ed.2d 560 (1979), and to exclude all reasonable hypotheses save that of her guilt." *Id.* at 378.

## III. ANALYSIS

### A. "Laundry Listed" Claims

Fortson denied any involvement in Benton's death. Doc. 15-3 at 73, 95. To prove she murdered him, the state adduced circumstantial and expert-witness opinion. *Id.* at 73. Through her lawyer, Bill Crecelius, Fortson challenged both. But Crecelius, she now complains, provided her with ineffective assistance in that effort. Docs. 1 & 14.

Fortson, represented by counsel here, doc. 1 at 7, 9, has more or less laundry-listed the bulk of her § 2254 claims. *Id.* at 23-34. They fail outright. Fortson must honor the claims-presentation standards in this venue. First, there is the heightened pleading standard:

> The § 2254 Rules and the [28 U.S.C.] § 2255 Rules mandate "fact pleading" as opposed to "notice pleading," as authorized under Federal Rule of Civil Procedure 8(a). Coupled with the form petition or motion, the federal rules give the petitioner or movant ample notice of this difference. If, for example, Rule 2(c)(1) and (2) of the § 2254 Rules should cause a petitioner (or his counsel) to doubt what the words "specify all grounds" and "state the facts supporting each ground" mean, the CAUTION contained in paragraph (9) of the "Instructions" should remove such doubt. As the Supreme Court has observed, "[h]abeas corpus petitions must meet *heightened* pleading requirements, *see* 28 U.S.C. § 2254 Rule 2(c)." *McFarland v. Scott*, 512 U.S. 849, 856, 114 S. Ct. 2568, 2572, 129 L.Ed.2d 666 (1994).

> The reason for the heightened pleading requirement -- fact pleading -- is obvious. Unlike a plaintiff pleading a case under Rule 8(a), the habeas petitioner ordinarily possesses, or has access to, the evidence necessary to establish the facts supporting his collateral claim; he necessarily became aware of them during the course of the criminal prosecution or sometime afterwards. The

evidence supporting a claim brought under the doctrine set forth in *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L.Ed.2d 215 (1963), for example, may not be available until the prosecution has run its course. The evidence supporting an ineffective assistance of counsel claim is available following the conviction, if not before. Whatever the claim, though, the petitioner is, or should be, aware of the evidence to support the claim before bringing his petition.

*Borden*, 646 F.3d at 810 (footnote omitted; emphasis added).

Second, petitioners must *argue* their claims. *Fils v. City of Aventura,* 647 F.3d 1272, 1284 (11th Cir. 2011) ("district courts cannot concoct or resurrect arguments neither made nor advanced by parties."); *id.* at * 9 (a district court "may *not*, however, act as a plaintiff's lawyer and construct the party's theory of liability from facts never alleged, alluded to, or mentioned during the litigation."). That includes citation to the record:

[A]ll of these principles of law would mean nothing if district courts were required to mine the record, prospecting for facts that the habeas petitioner overlooked and could have, but did not, bring to the surface in his petition. Making district courts dig through volumes of documents and transcripts would shift the burden of sifting from petitioners to the courts. With a typically heavy caseload and always limited resources, a district court cannot be expected to do a petitioner's work for him. *Cf. Adler v. Duval County School Board*, 112 F.3d 1475, 1481 n. 12 (11th Cir.1997) (noting in a civil case that, absent plain error, "it is not our place as an appellate court to second guess the litigants before us and grant them relief ... based on facts they did not relate."); *Johnson v. City of Fort Lauderdale*, 126 F.3d 1372, 1373 (11th Cir. 1997) ("[W]e are not obligated to cull the record ourselves in search of facts not

included in the statements of fact."). The Seventh Circuit memorably said that appellate judges "are not like pigs, hunting for truffles buried in briefs." *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991). Likewise, district court judges are not required to ferret out delectable facts buried in a massive record, like the one in this case, which was more than 25,000 pages of documents and transcripts.

*Chavez v. Sec'y Fla. Dep't of Corrs.*, 647 F.3d 1057, 1059-60 (11th Cir. 2011).

Those combined requirements mean that petitioners must *construct* their claims. In Claim 16 here, for example, Fortson argues that Crecelius "was ineffective in failing to object to leading questions of Scott Knowles,"[8] doc. 1 at 25 ¶ 16, and in Claim 19 she complains that

---

[8] Rarely will an improper leading question rise to the "fundamental unfairness" level needed to support § 2254 relief (hence, overturn a verdict and state court judgment). *See DelVecchio v. Wengler,* 2011 WL 3035110 at * 18 (D. Minn. Jun. 14, 2011) ("A ruling permitting the prosecution to ask leading questions, a matter of state evidentiary law, is only reviewable in a federal habeas corpus proceeding to determine whether it resulted in a trial so fundamentally unfair as to deny Petitioner due process. *See Wallace v. Lockhart*, 701 F.2d 719, 725 (8th Cir.1983), *cert. denied* 464 U.S. 934 (citing *Batten v. Scurr*, 649 F.2d 564, 569 (8th Cir.1981))"). The reason is best illustrated through a hypothetical leading question -- a question that suggests an answer:

Q. Did you go to the store that Monday morning?

DEFENSE COUNSEL: Objection, leading.

THE COURT: Sustained.

Q. What did you do on Monday morning?

A. I went to the store.

"[c]ounsel was ineffective in failing to object to hearsay testimony by Jerry Alexander." *Id.* at 26 ¶ 19. That is all she argues. And while she supplies record cites, she nevertheless impliedly asks this Court to glean from the *entire* record the surrounding facts needed to show *how* these evidentiary errors were material -- that (a) the unobjected-to testimony was tainted by hearsay or a leading question; *and* (b) it rendered her trial fundamentally unfair within the meaning of *Felker v. Turpin*, 83 F.3d 1303, 1311–12 (11th Cir. 1996); *see also Cooper v. Wise*, 2011 WL 1496477 at * 4 (11th Cir. Apr. 20, 2011).

The Court will not shoulder her burden. She met only part of it by pleading a claim and citing to the record. She must also show error that had "a substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 623 (quotes and cites omitted). That means she must describe the evidence, as viewed in

---

In too many cases the prosecution's witness will be sufficiently prepared that, especially for general background-detail type questions, no fact will be kept out of evidence by a "leading-question" objection. That is especially true in cases like this, where the prosecutor incessantly led his witnesses, and Crecelius risked irritating the jury with "jack-in-the-box objections." *See* doc. 15-22 at 12 (the state habeas court ruling explicitly credited Crecelius's opinion that "it is impossible for [the prosecutor] to not ask leading questions at trial."). If the witness, upon such objection, is likely to easily get the fact into the record anyway, then little is achieved by constantly objecting. Certainly the consideration locus changes where *critical* facts that would *not otherwise* be introduced are suggested within leading questions. But Fortson has not pointed to any such instance here.

favor of upholding the verdict, to demonstrate how the net subtraction of the tainted evidence (via putatively successful objection by defense counsel) would have undermined confidence in the verdict. *Strickler v. Greene*, 527 U.S. 263, 290 (1999) (the question is whether the evidence puts the case "in such a different light [so] as to undermine confidence in the verdict") (quotes and cite omitted); *cf. Davis v. Kemp*, 829 F.2d 1522, 1526 (11th Cir. 1987) (to determine whether a petitioner is entitled to relief based on the prosecutor's comments, court must engage in a two pronged analysis that considers: first, whether the prosecutor's comments were improper; and, second, whether any comments found to be improper were so prejudicial as to render the *entire* trial fundamentally unfair).

Finally, Fortson must thread all of that through the double-deference IAC criteria detailed above -- she therefore must show that no reasonable attorney would have failed so object, cross-examine, etc. And, she must show that the state habeas court's ruling on each claim was "§ 2254(d)-unreasonable." "Laundry lists" like Fortson's (Claims 3, 4, 8-28,

30-34, 37-42, 45-47) thus go nowhere.[9] They must be summarily denied. With few exceptions that leaves only the claims detailed in Fortson's supporting brief, doc. 14, to which the Court now turns.

## B. Expert Witness -- Geologist -- Claim

Fortson faults Crecelius for failing to meaningfully oppose the state's expert witness, geology professor Paul Schroeder, via cross-examination, doc. 1 at 27 ¶ 29, and with a rebuttal expert. Doc. 14 at 3-8. He testified that he found geologic similarities between the rocks contained in the trough tomb's concrete and the rock particles that police found in the bed of Fortson's pick-up truck. Doc. 17-6 at 48; doc. 15-3 at 20-21, 97, 100. The prosecutor cited that evidence in his closing argument. Doc. 15-3 at 21-22. The *Fortson* court relied on it. *Fortson*, 280 Ga. at 377 ("Concrete in the bed of her truck had the same geologic origin as that in which Benton's body was encased.").

---

[9] *See also Caderno v. United States*, 256 F.3d 1213, 1217 (11th Cir. 2001) (citing *Tejada v. Dugger*, 941 F.2d 1551, 1559 (11th Cir. 1991)); *see also United States v. Laetivial–Gonzalez*, 939 F.2d 1455, 1465 (11th Cir. 1991) (no evidentiary hearing required where movant's allegations fail to satisfy the prejudice prong of the *Strickland* ineffective assistance of counsel test); *Holmes v. United States*, 876 F.2d 1545, 1553 (11th Cir. 1989) (no hearing required on claims "which are based on unsupported generalizations"); *Rodriguez v. United States*, 473 F.2d 1042, 1043 (5th Cir. 1973) (no hearing required where petitioner alleged no facts to establish truth of his claims beyond bare conclusory allegations); *Johnson v. United States*, 2011 WL 3320565 at * 3 (S.D. Ga. Aug. 1, 2011).

At the state habeas evidentiary hearing Crecelius conceded that Schroeder's testimony was damaging but defended his decision to not call a rebuttal expert witness, much less heavily cross-examine Schroeder, because the most Schroeder could say was "that the rocks out of those concrete bags were the same rocks, same rocks that were in [Fortson's] truck. The best he could say is that they came from the same geological region, which would be true if we threw a shovel of dirt in the back of her truck." Doc. 15-3 at 82; *see also id.* at 96 (Schroeder "was not offering a direct opinion that substance from these concrete bags was the same identical substance in the back of Ms. Fortson's truck. He was offering an opinion that they came from a -- a local geological source.").

Crecelius also noted that he had signed onto the case in January 2004 and felt the trial judge would not alter the trial date, which was in the third week of March 2004. Doc. 15-3 at 103. He did not seek a continuance, though he concedes he could have at least asked for one. *Id.* at 104-05. He decided not to hire a defense expert because "I didn't feel like it was a wise use of our time and resources, given the *time* that we had to prepare for trial." *Id.* at 104 (emphasis added).

Fortson points to that concession in insisting that Crecelius's overarching "strategy" was to simply fulfill his assurance to the trial judge that he would not seek a continuance and simply wanted to keep that promise -- at Fortson's expense. Doc. 14 at 6. And on this and similar claims discussed *infra*, she cites what Crecelius said when asked about his overall defense strategy: "In general, we prepared ourselves to defend against the expert testimony we knew were coming. None of this testimony -- again, this remained a circumstantial case. There was not an expert that testified at trial that could offer a direct opinion linking Ms. Fortson to a murder." Doc. 15-3 at 75-76; *see also id.* at 76 ("But none of their experts were able to directly link Ms. Fortson to this murder.").

Fortson points to that and Crecelius's similar explanations as proof that he was ineffective. Doc. 14 at 5-6. It is obvious, she reminds, that no "circumstantial evidence" witness will *ever* "offer a direct opinion linking" a defendant to a crime. And it is equally obvious, she insists, that the prosecutor has figured that out, too. Hence, the state deploys layer upon layer of circumstantial evidence until it is satisfied that the

accumulation of those layers will convince the jury that the defendant is guilty beyond a reasonable doubt.

It follows, Fortson concludes, that it is defense counsel's *job* to negate each layer by impeaching it if not also rebutting it with counter-evidence. To simply do nothing and rationalize such indolence away by bespeaking the obvious -- that no expert witness "could offer a direct opinion linking Ms. Fortson to a murder" (a self-evident truth in *every* circumstantial evidence case) -- at best constitutes a blasé excuse for shirking a core defense responsibility: to zealously prevent each circumstantial evidence layer from accumulating. Doc. 14 at 7, 23-26.

The state habeas court, in an order authored by respondent's counsel and signed unchanged by the judge,[10] doc. 15-22 at 19, ruled that

---

[10] Fortson

> contends that the determination of factual issues made by the [state habeas judge] should not be presumed correct since [that judge] simply rubber-stamped the order denying the petition as prepared by the attorney general representing Respondent. *Jefferson v. Upton*, ___ U.S. ___, 130 S. Ct. 2217, 1220 (2010).

Doc. 14 at 22; *see also id.* at 26. But establishing that the state habeas judge signed an order authored by the state attorney does not establish that he merely "rubber stamped" that order and thereby abdicated his duty to exercise his independent judicial authority to decide the facts and apply the law to those facts. Nothing in the record suggests that the judge so abandoned his judicial role.

Crecelius was not ineffective because "[c]ounsel believed the evidence showed that the rocks came from the same wide geologic region, and this did not conclusively prove anything." *Id.* at 12. Not opting to hire a counter expert, then, was one of counsel's "reasonable and tactical methods for defending against [the state's] expert testimony at Petitioner's trial." *Id.* at 16.

Fortson insists that ruling is unreasonable because Crecelius simply did *not* "opt" not to hire a rebuttal expert geologist. Doc. 14 at 6. The real reason, she contends, is because he was short on time, having "promised the trial judge that he would be ready for trial when he accepted the case. No effort to obtain a continuance was made." *Id.* at 6. And the state court's ruling is unreasonable, she contends. Reasoning

---

Fortson's reliance upon *Jefferson* is also misplaced. In that case, the state habeas judge accepted a state-authored order *that included findings relating to a non-existent witness*. *Jefferson*, 130 S. Ct. at 2222. Based upon the highly peculiar facts at play, the Supreme Court remanded the case so that the lower courts could determine whether the state opinion deserved deference under the eight factors laid out in a 1966, pre-AEDPA version of 28 U.S.C. § 2254(d); the Eleventh Circuit erred by only considering one of the eight factors. *Id.* at 2222-23. The *Jefferson* Court even noted that a "court's verbatim adoption of findings of fact prepared by prevailing parties should be treated as findings of the court," though it also noted that it had criticized that practice. *Id.* at 2223 ("Although we have stated that a court's verbatim adoption of findings of fact prepared by prevailing parties should be treated as findings of the court, we have also criticized that practice." (internal quotations omitted)). Still, it declined to hold that such opinions are not worthy of § 2254 deference.

that "none of the [state's expert witnesses] could conclusively say [she] committed the crimes alleged in the indictment" is *not* a reasonable trial strategy:

> No circumstantial witness, and certainly no expert witness, can *ever* conclusively say that an accused committed the crimes charged. If they could it would not be [a] circumstantial evidence case. And that is no excuse for a total failure of the defense to challenge the damaging expert opinion, especially where there is contrary expert opinion available (*See* affidavit of William Schneck).

*Id.* at 7 (emphasis added). Crecelius could have, but failed, to seek a continuance. *Id.* at 7-8. Fortson cites her own expert's opinion (obtained for habeas) that there is no reliable connection between the cement samples, *id.* at 4 (the Court finds no such opinion in the record, however), to show that this would have made a difference at trial. *Id.*

As it has done before and as noted *supra*, the state has responded with a largely unhelpful, canned brief. First, it consumes many pages repeating verbatim pleadings and rulings already in the record, then follows that with boilerplate governing standards. Doc. 13-1 at 2-20. Then it simply parrots the state habeas court's ruling (authored by *respondent's* counsel) in concluding that Crecelius's representation was "reasonable," *without* explaining how or why. Doc. 13-1 at 14 (quoting

ruling): "[c]ounsel demonstrated reasonable and tactical methods for defending against the expert testimony presented at [Fortson's] trial." *Id.* at 16; *see also id.* at 19 ("Here, the state habeas corpus court focused mainly upon the attorney 'error' prong and found that Petitioner had not met [her] burden with respect to the claims of attorney error").[11]

Nevertheless, this claim must be denied. In a circumstantial evidence case the jury is asked to infer, for example, that if the prosecution presents them with a photo of human footprints in the snow then someone has walked through it. No defense lawyer would bother to

---

[11] As this Court recently reminded Georgia's Attorney General in another "attorney-authored," state habeas case:

> [I]t is unacceptable to acknowledge petitioner's ineffective-assistance of counsel claims (Grounds 6 and 11, *see* doc. 15 at 15–16; *id.* at 21–23) but then argue, simply, "that these grounds lack merit." Doc. 37–1. That does not constitute briefing of the issues before this Court. In fact, it smacks of the same sort of "canned brief" style rejected by this Court in *Mikell v. Brian*, CV409-071, doc. 14 at 13 n. 5 (S.D. Ga. Nov. 11, 2010) (after noting the same conclusory rejection of petitioner Mikell's ineffective-assistance claims in both the attorney-authored state habeas court order and in counsel's § 2254 opposition brief, the Court concluded: "Hence, respondent has submitted a canned brief that more or less can been re-used in many an IAC-based, § 2254 case before this Court. Such briefing, as well as the attorney-authored Final Order (*see* doc. 5-4 at 47) is largely unhelpful, since a conscientious Court must (for *Strickland* deficiency/prejudice prong purposes) at least partially merits-examine many IAC claims.").

*French,* 2011 WL 2491595 at * 2; *see also supra* n. 4. Note that, after this Court directed respondent to re-file the *Fortson* transcript, doc. 16, respondent's counsel opted to file a "Supplemental" brief. Doc. 19. Yet, it does no more than his original brief -- pages of boilerplate followed by the same circular, conclusory analysis. *See also* doc. 20 (Fortson sees no need to respond). It thus will not be further cited here.

call a rebuttal expert to opine that no one walked through that snow. But if the state calls an expert to opine that the shoeprint pattern matched the defendant's, then counsel must exercise reasonable judgment. And if the shoeprint matches an exotic shoe that very few, including the defendant, are known to have worn, then one would be hard pressed to explain why defense counsel did not at least investigate the development of a rebuttal explanation.

Here all the state showed was that the metaphorical "shoeprint" matched that of myriad denizens, including Fortson. (After all, it is not unusual for those in a rural community to buy concrete mix and have a residue of it along with soil, hay, and a wide range of other materials in the back of their pick-up trucks). It thus narrowed the jury's focus only to a wide and thus inconsequential range of people.

To that end, the prosecution adduced plenty of other (though concededly not overwhelming) evidence tying Fortson's truck, and thus her, to the crime. That included law enforcement testimony and video. The police connected Fortson's truck to the trough-tomb's dump point by driving it to that location and matching the scratches on the truck to the markings on the nearby trees -- indicating that Fortson had scraped her

truck against them while dumping the trough tomb. Doc. 17-5 at 73-74; doc. 17-6 at 2-8, 122. They also showed how the truck's soil and wet-cement residue patterns were consistent with the truck's use in depositing the trough-tomb where it was found. Doc. 17-5 at 73-74; doc. 17-6 at 2-8. They further showed that the truck was well capable of handling such a load, without even noticeably dipping downward from the weight. Doc. 17-6 at 11-12. And, they backed her truck up to Benton's porch to show how Fortson could, with cables, get the trough tomb into her truck and then, later, deposit it behind the trees where it was found. Doc. 17-5 at 73-74.

All of that was accompanied by the paint-similarity and "truck note" evidence (including an expert opinion that she wrote it, doc. 17-6 at 311), the fact that Fortson herself admitted to a "rocky" relationship with Benton, doc. 17-6 at 115; *see also* doc. 17-7 at 34, and the fact that the police found a fresh new shower curtain in her home just after discovering Benton's body. Doc. 17-6 at 121.[12] And Fortson herself

---

[12] Crecelius countered with expert witness opinion evidence showing that the bullet that killed Benton could have come not just from the rifles seized from Fortson's home but a wide range of rifles and handguns. Doc. 17-6 at 131-33. He also called a rebuttal expert to negate the state's showing that Fortson wrote the "truck note." Doc. 17-7 at 7-22.

brought out evidence that she had contemporaneously purchased a new trough and shower curtain.[13] This reinforced the testimony of employees from a local store, who testified that on June 4, 2000, Fortson had purchased "Sakrete" (a concrete mix) and a 2 x 2 x 6' water trough. Doc. 17-5 at 12-13, 16, 20-21.

---

[13] Crecelius had Fortson's daughter, Elise Fortson, testify that she lived with her mother and that the two went shopping the day Benton was murdered, when they bought a new shower curtain together. Her mother, she testified, did not act unusual that day or during the days that followed. She also recalled that her mother bought a trough for their horse and that the two of them had planned to lay a concrete slab under their dog pen. Doc. 17-7 at 22-29.

Crecelius also called Tracy Fortson herself, who provided counter-explanations to the state's evidence against her. *See, e.g.*, *id.* at 35-36 (she damaged her truck from hunting activities, etc.); *id.* at 37-60 (when she left Benton's home on the morning of June 4th, he was asleep on his sofa, and she spent part of that day buying, *inter alia*, a trough for her horse and ten bags of concrete mix for her dog pen, deposited them at her home; then she picked up Elise at a mall to go shopping for various items, including a new shower curtain needed to replace a worn-out one; that night she returned to Benton's and he was still there, feeding his birds; they had been dating only nine months and she had no key to his home; nothing remarkable then occurred, and she went back to her home after a couple hours; the next day she noticed her new trough and concrete were gone but belongings she had left at Benton's had been returned, which led her to believe that Benton had brought them back and helped himself to her trough and concrete; she later went over to his house, where he was feeding his birds, but did not see her trough and concrete anywhere; they talked very little, she left, and never saw him again; but she did receive from him a voicemail -- later automatically erased by her voicemail service -- instructing her not to call him anymore, "that he didn't need a woman and he just didn't want me back over there," so she never returned nor tried to contact him again); *id.* at 61-67 (she counter-explained matters like her rifles, the paints found at her home, and that she owned no kerosene nor candles like those found in Benton's home, etc.); *id.* at 68 (she testified that Benton had assisted in the conviction of "Bear Appling," known drug dealer, and Benton feared reprisal from him). The state effectively cross-examined Fortson, eliciting damaging admissions from her. *Id.* at 73-88.

That other evidence, including the defense evidence, informs the net impact of Schroeder's testimony, which would otherwise stand out were it the only evidence connecting Fortson to the trough tomb containing Benton's body. Hence, even with plenty of time and money to secure a defense expert witness, it cannot be said that in this situation no attorney would have passed on the opportunity to hire an expert to rebut Schroeder.[14]

It thus was not unreasonable for Crecelius to devote his resources elsewhere. And even if Crecelius's decision to "lay down" on Schroeder's testimony in retrospect appears incorrect, it cannot be said to be "so patently unreasonable that no attorney would have chosen it," *Adams v. Wainwright*, 709 F.2d 1443, 1445 (11th Cir. 1984), much less that had he done so there is a "reasonable probability that the verdict [otherwise] would have been different." *Kimmelman v. Morrison*, 477 U.S. 365, 375

---

[14] *See Woodard v. Thaler*, 414 F. App'x 675, 681 (5th Cir. 2011) (no IAC by attorney for capital murder defendant who decided not to attack defendant's identification through use of an eyewitness expert; counsel considered use of an eyewitness expert but made a tactical decision against it based on his belief that his cross-examination of witness would be sufficient to refute the accuracy of the identification, and the identification testimony, which was circumstantial evidence placing defendant at the scene of the murder, was merely one piece of a comprehensive suite of overwhelming evidence pointing to defendant's guilt).

(1986). It follows that the state habeas court's ruling on this claim was not "§ 2254(d)-unreasonable."

## C. Ralph Stone

The state called Georgia Bureau of Investigation (GBI) Special Agent Ralph Stone to opine on what was, at bottom, something lay jurors could easily have inferred from the facts alone: that Benton, because he was asleep or otherwise inattentive while in his underwear when he was killed, likely was shot by someone he trusted. Crecelius did not object. Doc. 15-3 at 27. Fortson faults him for that. The omission arises against other, context-setting evidence that the state got admitted: that Benton and Fortson had been dating, doc. 17-4 at 92, "they had had an on again off again relationship, rocky at times," doc. 17-5 at 48; *see also* doc. 17-6 at 115, and had a "pretty serious" argument on the last day Benton was seen by anyone. Doc. 17-4 at 93; *see also id.* at 73-75.

Crecelius conceded that Stone's testimony was damaging "if the jury had that and nothing more." Doc. 15-3 at 106. But "[f]rom hearing the testimony, it was not otherwise impressive. I mean, I'm not sure there was anybody in that room that thinks that somebody can examine how somebody was sitting or [lying] when they were killed and formulate

a valid opinion that they were killed by someone they trusted." *Id.*; *see also id.* at 108 ("I didn't object to it because it did not come across as credible and believable as he said it . . . I don't see how anybody could have an opinion that somebody was shot by somebody they trusted because how they were laying on the sofa."). The state habeas judge accepted this explanation as reasonable. Doc. 15-22 at 14.

Again, in his brief the respondent has simply set out Fortson's claims, recited the governing standards, then argued, in essence, that the state habeas court did not err . . . because it did not err: "Petitioner has not shown that the state habeas court unreasonably applied *Strickland* to the facts of this case, so . . . these findings should be given deference . . . . Respondent urges this Court to deny relief as to any trial and appellate counsel ineffectiveness claim." Doc. 13-1 at 20.

The Court agrees with Fortson that Stone's testimony was objectionable because it at best was speculation-based and at worst Stone was simply a "closing-argument" witness. *See also* doc. 15-11 at 27-28. Perhaps very few lawyers would have failed to object, especially since it cost nothing beyond the risk of irritating the jury (by "yet another objection") to do so. But had counsel done so, would it have made an

outcome-altering difference? The answer is no because Stone supplied no additional weight to the state's case. That Benton was caught asleep or by surprise was obvious and undisputed: Whoever shot Benton was able to press their gun to the top of his head. Doc. 17-5 at 110 (forensic pathologist who autopsied Benton's body affirming his opinion that the gun's "muzzle was apparently . . . pressed against the top of the head."); *id.* at 140 ("the muzzle was in contact with the skin at the time the weapon was discharged."); *id.* at 95 ("the gunshot wound was right to the top of the head there."); doc. 17-6 at 18 (the fatal shot "had to be [made] there on the couch with his head on that arm.").

With evidence of no defensive movement or forced entry, a reasonable lay person could deduce on his own that Benton was either around someone he trusted or otherwise caught off guard. Hearing an expert opine to that effect would have added little, if anything, to the jury's consideration mix. Even reviewing this claim *de novo*, the *Strickland* standard is met because it cannot be said that counsel's representation fell outside the "wide range" of reasonable professional assistance. *Strickland*, 466 U.S. at 689. Fortson, therefore, has not

shown that there is no "reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington*, 131 S. Ct. at 788.

## D. Terry Cooper

GBI Agent Terry Cooper testified for the prosecution that whoever handled the piece of finger-print-lifting tape used to attach the above-mentioned note on Benton's truck must have been wearing "a smooth glove." Doc. 17-5 at 116. Crecelius concedes he made no objection and offered no counter expert on this point. Doc. 15-3 at 114-16. But he justified that by discounting the testimony as much ado about nothing. *Id.* In the state habeas proceeding Fortson presented an expert's opinion that there is no way anyone can tell if a person was wearing latex gloves simply because no ridge lines were found in the latent finger prints. Doc. 15-11 at 26. The habeas judge ruled that Crecelius was not ineffective because he reasonably believed this evidence "too generalized to prove Petitioner's guilty in the case." Doc. 15-22 at 14; *see also id.* at 16 ("Counsel demonstrated reasonable and tactical methods for defending against the [state's] expert testimony. . . .").

Fortson insists effective counsel would have at least engaged such an expert "to rebut Cooper's opinion or at the very least challenge [his]

opinion on cross examination." Doc. 14 at 14. The omission was prejudicial, she insists, because Cooper's testimony was an important part of the state's circumstantial puzzle. The fact that the killer wore latex gloves, and some were found in Fortson's home, narrows the field of potential culprits to a very small group, to which she belonged. Given the level of damage to the defense, she concludes, no reasonable attorney would have failed to challenge this opinion evidence. *Id.* Again, as with every last IAC claim, respondent relies on circular, conclusory reasoning. Doc. 13-1 at 20. Its brief is essentially useless to the Court's analysis.

The Court notes Crecelius's stated strategy, as conveyed through the question he asked Fortson's habeas counsel: "Is the fact that Ms. Fortson has some latex gloves, along with a million other people, does that prove that she was the one wearing the latex gloves? I did not launch an attack against this testimony other than what you read here in the record." Doc. 15-3 at 114; *see also id.* at 115-16 (Crecelius explained that "I was lot more interested in the jury thinking that Tracy Fortson had nothing to do with any of this. I didn't feel like what kind of gloves somebody is wearing when they put some tape on a window was going to carry the day. I was a lot more interested in them thinking it was not

her to begin with. There was a lot more compelling evidence right there at the scene where that truck is, which we did devote time to, to show that she did not park that truck in its resting spot at the neighbor's house.").

That strategy leaves much to be desired. It would have cost Crecelius very little to at least bring those minimization points out in cross-examination, yet he did not. In hindsight, many if not most attorneys probably would have done so. But hindsight is not permitted here, and choosing not to object and fight the prosecution at every last turn -- as "jack-in-the-box" objecting risks jury umbrage -- cannot be said to be "so patently unreasonable that no attorney would have chosen it," *Adams*, 709 F.2d at 1445, much less that had he done so there is a "reasonable probability that the verdict [otherwise] would have been different." *Kimmelman*, 477 U.S. at 375. Again, the net increase in inculpatory evidence via Cooper was at worst marginal: Any reasonable juror could imagine plenty of ways to use tape without leaving a fingerprint on it. And there is little difference between latex gloves, much less "police-issued" latex gloves, and other smooth-skinned (e.g., leather) gloves that likewise would leave no prints. Crecelius, for that

matter, elicited on cross examination of a prosecution witness that the police failed to find, upon executing a search warrant of Fortson's house, a number of items (e.g., kerosene, camouflage-painting stencils), including a fingerprint kit (which ordinarily contains latex gloves). Doc. 17-5 at 80-81. This claim, too, must be denied.

## E. The Search Warrant

Fortson next faults Crecelius for failing to file a motion to suppress evidence seized during the search of her home. Doc. 1 at 32-33 ¶ 48; doc. 14 at 15-22.[15] The warrant authorizing that search was issued by state court Magistrate Gail Smith, who is married to Mike Smith (Mike), one of the investigating law enforcement officers in this case. Doc. 14 at 15. Fortson contends that the warrant was a nullity because Magistrate Smith was not "neutral and detached," in violation of the Fourth Amendment.[16] *Id.* at 15-16.

_____

[15] Respondent argues that this claim is procedurally defaulted, doc. 13 at 4-5 ¶(d); doc. 13-1 at 22, yet the very state habeas order authored by respondent's counsel shows that the state habeas court reached the issue on the merits, and did not even mention procedural default. Doc. 15-22 at 13; *see also* doc. 15-3 at 7-16 (evidence taken on this issue at Fortson's state habeas evidentiary hearing).

[16] Another legal basis exists to support a neutrality-violation claim:

While most claims of judicial bias are resolved "by common law, statute, or the professional standards of the bench and bar," the Due Process Clause of the

At the state habeas hearing, Crecelius testified that he saw such a motion as a loser -- it had gone nowhere in the first trial, he insisted. [17] Doc. 15-3 at 84-85.  But there it was challenged for lack of probable

---

Fourteenth Amendment "establishes a constitutional floor." *Bracy v. Gramley*, 520 U.S. 899, 904, 117 S. Ct. 1793, 138 L.Ed.2d 97 (1997) (citations omitted). To safeguard the right to a fair trial, the Constitution requires judicial recusal in cases where "the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable." *Withrow v. Larkin*, 421 U.S. 35, 47, 95 S. Ct. 1456, 43 L.Ed.2d 712 (1975). "The Court asks not whether the judge is actually, subjectively biased, but whether the average judge in his position is likely to be neutral, or whether there is an unconstitutional potential for bias." *Caperton v. A.T. Massey Coal Co.*, —— U.S. ——, 129 S. Ct. 2252, 2262, 173 L.Ed.2d 1208 (2009) (internal quotation marks omitted).

*Hurles v. Ryan*, ___ F.3d ___, 2011 WL 2641287 at * 6 (11th Cir. July 7, 2011); *see also id.* (claimant need not prove actual bias to make out a due process violation, since it would be nearly impossible for a litigant to prove actual bias on the part of a judge); *id.* at * 7 ("At bottom, then, the Court has found a due process violation when a judge holds two irreconcilable roles, such that her role as an impartial arbiter could become compromised.").  Fortson did not raise that ground here, doc. 14 at 15-22 (limiting her argument to Fourth Amendment grounds only), so it will not be considered.

[17]    He also reasoned that the items recovered from Fortson's home were not individually incriminating.  Doc. 15-3 at 85 ("They found a receipt where the shower curtain was purchased.  But that was evidence that was not in dispute.  There was nobody denying that . . . .  There were a number of things that they ultimately tried to use against her that they would have been able to use regardless of the legality of the search warrant.").

Fortson, in contrast, cites a raft of material evidence that she argues could have been excluded and thus would have altered her trial's outcome had this issue been raised and thus litigated.  Doc. 14 at 18-19 (the search netted Fortson's .22 rifle, argued by the prosecution to be consistent with the murder weapon; it also fetched .22 rifle shells also deemed consistent, a box of latex gloves, and some writings by Fortson which depicted her as troubled and anguished).  Crecelius agreed that these items were "very damaging" to her case.  Doc. 15-3 at 121.

cause, not on neutrality grounds. *Fortson v. State*, 277 Ga. 164, 167-68 (2003). Nevertheless, the state habeas judge ruled, simply, that "there is no evidence in the record to show that [Smith] was not neutral and detached. . . . Counsel was not ineffective for [not] seeking to further challenge the warrant based on the judge's impartiality." Doc. 15-22 at 18 (cites omitted).

This presents a multi-layered claim. Ultimately, the question is whether the state habeas judge's determination that Crecelius rendered satisfactory performance under the Sixth Amendment was reasonable under § 2254(d).[18] In order to fairly answer that question, however, the

---

[18] At the outset, Fortson contends that the state habeas judge applied the wrong legal standard when evaluating Magistrate Smith's neutrality since he relied upon her subjective self-assessment rather than looking solely to the objective facts. Doc. 14 at 17; doc. 15-22 at 18 ("This is especially true in light of [her] own testimony."). The state habeas judge, however, never made clear the standard he applied. Doc. 15-22 at 18. He may have relied upon the magistrate's relation of certain objective facts independent of her personal opinion as to her partiality. *Id.*

In any event, the Court does not accept Fortson's contention that a magistrate's subjective self-assessment is entirely irrelevant to the analysis. Certainly, where objective facts outside of the magistrate's subjective self-assessment demonstrate the impossibility of a neutral and detached posture, it is unnecessary to explore the magistrate's subjective beliefs. Indeed, the Supreme Court has carved out certain *per se* neutrality violations in such instances. *See Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319, 326-27 (1979) ("We need not question the subjective belief of the Town Justice in the propriety of his actions, but the objective facts of record manifest an erosion of whatever neutral and detached posture existed at the outset" since he "allowed himself to become a member, if not the leader, of the search party which was essentially a police operation."); *see also Connally v. Georgia*, 429 U.S. 245, 249-50 (1977) (declaring Georgia's warrant-issuing system unconstitutional because

Court must also evaluate the Magistrate Smith neutrality issue and Crecelius's performance in addressing that claim. While this is not *de novo* review, an exploration of each analytical "layer" is required.

At its core, the inquiry here turns on whether Fortson's suggestion that Magistrate Smith had "thrown in" with law enforcement holds water. Admittedly, no Supreme Court case has directly addressed the issue we have here -- whether a magistrate fails to "manifest" the

---

magistrates were paid based on the number of warrants they issued, noting that "[t]he situation, again, is one which offers a possible temptation to *the average man* as a judge or which might lead him not to hold the balance nice, clear and true between the State and the accused.'") (quotes, cite and alteration omitted; emphasis added); *Coolidge v. New Hampshire*, 403 U.S. 443, 449-50 (1971) (a [state attorney general's] probable cause determination and issuance of a search warrant constituted a *per se* neutrality violation). But here the objective facts only suggest the *possibility* of bias due to the magistrate's family relationship to one of the investigators mentioned in the affidavit. (She did not, for example, participate in a police investigation or issue warrants for pay.) In such a situation, the magistrate's subjective impressions *are* relevant, even if the test is ultimately objective -- whether a reasonable outside observer would believe that the magistrate was unable to assess impartially the existence of probable cause supporting the search warrant. *United States v. Mathison*, 157 F.3d 541 at 548 (8th Cir. 1998).

In other words, while the magistrate's self-assessment is not dispositive, it is a valid factor to consider. Had Magistrate Smith testified that she deeply resented Fortson and would have issued the warrant even absent probable cause, no one would doubt that she lacked neutrality. Faced with such a record, Fortson would rightly argue that the magistrate's admitted lack of impartiality should invalidate the warrant. *See United States v. Czuprynski*, 46 F.3d 560, 564 (6th Cir. 1995) (where an issuing magistrate was involved in a dispute with the defendant 13 years earlier, it was relevant to inquire as to whether the magistrate still harbored resentment towards the defendant or was otherwise unable to review the information before him in an objective manner); *Mathison*, 157 F.3d 541, 548 (a defendant who had openly criticized the issuing judge on a prior occasion must at least bring forward evidence suggesting that the issuing magistrate was subjectively aware of the criticisms when mounting a neutral and detached challenge).

requisite "neutrality and detachment" based upon her familial ties to law enforcement agents involved in a matter under her review.  Absent clear guidance, the Court is guided by general principles.

According to the Supreme Court,

> the courts must . . . insist that the magistrate purport to "perform his 'neutral and detached' function and not serve merely as a rubber stamp for the police." *Aguilar v. Texas, supra*, 378 U.S., at 111, 84 S. Ct., at 1512. *See Illinois v. Gates, supra*, 462 U.S., at 239, 103 S. Ct., at 2332. A magistrate failing to "manifest that neutrality and detachment demanded of a judicial officer when presented with a warrant application" and who acts instead as "an adjunct law enforcement officer" cannot provide valid authorization for an otherwise unconstitutional search. *Lo–Ji Sales, Inc. v. New York*, 442 U.S. 319, 326–327, 99 S. Ct. 2319, 2324–2325, 60 L.Ed.2d 920 (1979).

*United States v. Leon*, 468 U.S. 897, 914 (1984).  In addressing such issues, courts should look at "the specific circumstances surrounding the issuance of the warrant and decide whether the magistrate manifested [the] neutrality and detachment demanded of a judicial officer when presented with a warrant application. . . ." *United States v. Ramirez*, 63 F.3d 937, 941 (10th Cir. 1995).

Here, Magistrate Smith presides in a rural Georgia county, where she signs four or five search warrants a year.  Doc. 15-3 at 13.  She admitted during Fortson's habeas hearing that when she issued the

warrant (a) she knew her husband, Mike, was part of the law enforcement team that located Benton's body, and (b) she had heard a rumor that Fortson, a former deputy with his department, had filed a sexual harassment complaint filed against it. *Id.* at 10-11. But she was unaware, she testified, that the harassment complaint implicated her husband. *Id.* at 11. She testified that she would have recused herself if he had approached her directly for the warrant, but here the warrant's five-page affidavit came from a GBI agent and only mentioned Mike's name in the factual background portion. *Id.* at 13-14.

The warrant affidavit itself shows that Mike, while employed as an investigator for the Oglethorpe County Sheriff's Office, worked along with agents from the Madison County Sheriff's Office and the Georgia Bureau of Investigation (GBI) during the investigation of the Doug Benton homicide. Doc. 15-8 at 9. His involvement in the events laid out in the affidavit was relatively minor. He received a phone call from a local property owner complaining of a reeking galvanized watering trough they found on their property. *Id.* GBI Special Agent Ben Williams, the affiant, responded to the scene with him, where they

discovered Benton's decomposing remains. *Id.* Mike Smith's name never appears again in the warrant affidavit. *Id.* at 7-11.

Magistrate Smith knew that her husband had been involved in discovering Benton's body -- nothing more. In other words, she knew that her husband participated in, but was not at the central core of, the multi-agency murder investigation. While the Court has not located a single case suggesting that such a family connection would nullify the warrant, recusal would certainly have been the more prudent option.[19] But as other courts have recognized, recusal is not always required under such circumstances. *See United States v. McKeever*, 906 F.2d 129, 131 (5th Cir. 1990) (magistrate was sufficiently detached even though her spouse was a reserve deputy with the sheriff's department who was not present during the search or issuance of the search warrant); *Brown v. Dietrick*, 444 S.E.2d 47, 53-54 (W. Va. 1994) (fact that magistrate's spouse is chief of police of small police force does not automatically disqualify magistrate, who is otherwise neutral and detached, from

---

[19] As some courts have noted, however, rural areas present special problems, since there are often no other magistrates about. *See Commonwealth v. Sharp*, 683 A.2d 1219, 1222-23 (Pa. Super. Ct. 1996) ("Rural or sparsely populated counties are not amenable to the convenient solutions afforded by a more densely developed environment. In smaller jurisdictions with few magistrates, the reality is that only one District Justice may be present within the county, let alone on call; and where simple alternatives are not always available.").

issuing warrant sought by another member of such police force); *Clark v. State*, 217 Ga. App. 113, 117 (1995) (magistrate's neutrality was not impaired by the fact that her son was a police officer for the same police department which obtained the search warrant, where the son was not involved in the case in any way). In this case, the warrant itself was presented by the GBI, a separate agency, the magistrate's husband was not present at its issuance, and the affidavit primarily involved the work and evidence uncovered by many other investigators working on the case. *See Commonwealth v. Brandenburg*, 114 S.W.3d 830, 833 n.1 (Ky. 2003) (while a magistrate could not issue warrants prepared by her husband's employer, the Commonwealth Attorney's Office, she could sign warrants prepared by the local county prosecutor); *McKeever*, 906 F.2d at 131 (husband's absence at the warrant issuance is a factor weighing in favor of an issuing magistrate's non-recusal determination). The facts and case law establish, therefore, that there is no *per se* rule of recusal applicable here.

Moving on to the next layer, whether Crecelius performed deficiently in pursuing the neutrality matter, a reasonable attorney faced with the factual scenario described above could conclude that the

situation presented a close call. But he would be faced with another

hurdle. As explained by Professor LaFave,

> the necessity to resolve that particular issue [(whether the magistrate was neutral and detached)] appears to have been largely obviated as a consequence of the Supreme Court's decision in *United States v. Leon*. The Court there adopted a sort of good faith exception to the exclusionary rule for with-warrant cases, so that exclusion of presumably illegally obtained evidence is no longer mandated as a Fourth Amendment matter if the officers who obtained and executed the warrant had "reasonable grounds for believing that the warrant was properly issued." Because this is so, it would seem . . . that whether the person who issued the warrant in fact qualified as a neutral and detached magistrate is no longer determinative on the suppression issue. Rather, the question is whether it was "objectively reasonable" for the officers who obtained and executed the search warrant to assume that the person issuing it was constitutionally authorized to do so. As is highlighted by the fact that the Court in *Leon* concluded the exclusionary rule was unnecessary to deter magistrates from engaging in improper conduct, this means that neither intense bias by the issuing magistrate nor his total failure to assess the search warrant affidavit requires suppression unless the police reasonably should have known the facts demonstrating those circumstances.

2 WAYNE R. LaFAVE, SEARCH AND SEIZURE § 4.2 (2011 ed.). The Sixth

Circuit, at least, has repeatedly held that an officer's good faith reliance

on a warrant prevents exclusion unless he knew or should have known

that the magistrate abandoned her neutral and detached function. *E.g.*,

*United States v. Rodriguez-Suazo*, 346 F.3d 637, 649 (6th Cir. 2003);

*Czuprynski*, 46 F.3d at 564 (even if magistrate biased because of dispute

with defendant 13 years earlier, *Leon* still applicable because officer seeking warrant "had no knowledge of any personal feud"). An attorney standing in Crecelius's shoes, then, might conclude that he had little chance of success in pursuing such a claim, and that his client would be best served by expending his limited resources elsewhere.

All of this shows that the state habeas judge's ruling on the ineffective assistance of counsel claim was reasonable under § 2254(d). Indeed, even without § 2254(d)'s deferential review, this claim fails. The neutrality claim was not persuasive, and a reasonable attorney faced with such a claim could conclude that even if it had weight, *Leon* would undermine any victory.

## F. Mary Horton

The state called GBI forensic microanalyst Mary Horton, who testified about similarities between paint found in Fortson's truck and storage shed and the camouflaging paint used on the trough tomb. She found five colors of paint on the trough tomb: two black, a dark green, and tan. One of the blacks did not match the paint taken from Fortson. The others were "alike." Doc. 17-6 at 88-89. The black and tan paint were also "like" the camouflaging paint found on the mailbox for

Fortson's home. *Id.* at 89. However, one can of black and one can of green paint did *not* have a "common source" with the paint found on the trough tomb. *Id.* at 89-90.

On cross-examination Crecelius underscored Horton's *dissimilarity* finding (the two paint colors noted above), *id.* at 91-92, 93, and got her to concede that she at most opined that the matching paints were only of the same general *types* of paint: "Q. [Y]ou can't say that [the trough tomb paints] *came out of* those cans [of paint taken from Fortson], but that this was just the type that is consistent with that type of paint, is that correct? A. That is correct." *Id.* at 93 (emphasis added).

On re-direct the state elicited her additional opinion that "the fact that there are three different spray paint cans like the paint on the container[--] it is my opinion that there is strong evidence that the paint on the container originated from these empty spray paint cans." *Id.* at 94-95. Following his unsuccessful objection that Horton was merely speculating on that point, Crecelius again cross-examined her, and she admitted that she was not claiming that the trough tomb paint came from Fortson's spray paint cans, only that, given the circumstances "it is strong evidence because those three cans are in place at one time that

the three types of paint that was found on the [trough tomb] originated from those three paint cans." *Id.* She then further conceded, upon his additional cross, that "it would be stronger evidence . . . if somebody found all four cans [on Fortson's possession] that were consistent since there were four types of paint on the trough. . . ." *Id.* at 95-96.

Fortson raises a cluster of claims here. The Court denies outright Claims 3, 4, and 34. *See* doc. 1 at 23 ¶ 3 (Crecelius provided IAC "by failing to defend against the expert testimony of prosecution expert Mary Horton."); *id.* at 24 ¶ 7 (IAC for "failing to raise the issues presented in Grounds one through Seven."); *id.* at 28 ¶ 34 (IAC "in failing to object to leading questions of Mary Horton."). Such unparticularized and unsupported claims go nowhere. *See* section III A, *supra*.

Claims 35 & 36 are "due process" based. *Id.* at 28 ¶ 35 (petitioner was denied due process of law because Horton testified outside her area of expertise -- the unsuccessful "speculation" objection noted above); *id.* at 29 ¶ 36 (Crecelius "was ineffective in failing to object to the Mary Horton opinion evidence on the basis of a due process violation"); doc. 15-2 ¶ 39 (raised before the state habeas court). Respondent insists Fortson has procedurally defaulted Claim 35 and an unrelated claim,

Claim 51 ("Actual prejudice resulted from the cumulative effect of the constitutionally deficient performance of counsel set forth above such that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different."). Doc. 13 at 4; doc. 13-1 at 20. Frequently, such a defense loops this Court back into an IAC-based analysis (i.e., the petitioner argues against such default because his attorney was *ineffective* for defaulting it in the first place, and that supplies cause and prejudice for overcoming the default),[20] but here Fortson is *not* arguing, on Claim 35, that Crecelius was ineffective for failing to raise a due process argument at trial or on appeal. Doc. 1 at 23-34. Thus, she is not making any attempt to overcome procedural default.

For that matter, respondent raised this procedural default defense in her December 3, 2010 response, doc. 13-1 at 20, and Fortson was free to, yet did not, respond to it in her December 9, 2010 brief. Nor did she exercise her right to do so in any supplemental brief. *See* S.D. Ga. LR

---

[20] Failure to timely raise a defense or claim can procedurally default it (bar it from being raised here), and a petitioner then must show cause and prejudice to overcome it. *Greene v. Upton*, 644 F.3d 1145, 1154 (11th Cir. 2011). IAC can supply cause to excuse procedural default if that IAC claim itself is not procedurally defaulted. *Edwards v. Carpenter*, 529 U.S. 446, 451–52 (2000); *Taylor v. Sec'y, Dep't of Corrs.*, 2011 WL 2160341 at * 63 (M.D. Fla. Jun. 1, 2011). Fortson does not argue that, however.

7.6; *Podger v. Gulfstream Aerospace Corp.*, 212 F.R.D. 609, 609 (S.D. Ga. 2003) ("parties may file as many reply briefs as they want"); *see also* doc. 20. The same must be said for Claim 51. Hence, both claims are procedurally defaulted and barred.

Even were this Court to "skip over" claim 35's default, *Loggins v. Thomas*, ___ F.3d ___, 2011 WL 3903402 at * 10 (11th Cir. Sep. 7, 2011) ("When relief is due to be denied even if claims are not procedurally barred, we can skip over the procedural bar issues. . . ."), it would still fail. Crecelius effectively cross-examined Horton to the point where her "speculation" opinion was rendered demonstrably weightless; he forced her to admit that she was opining only on the strength of the evidence, and not adding to her base opinion that only three of Fortson's four paint cans bore the same *type* of paint (but in fact were not necessarily the *actual* paint). Her testimony thus consisted simply of her commenting on how probative she felt that opinion was -- something the jury could both see through and decide for themselves.

It follows that Fortson's claimed error (on Claim 35) cannot be said to have had "a substantial and injurious effect or influence in determining the jury's verdict," *Brecht*, 507 U.S. at 623, nor to have

undermined confidence in the verdict. *Strickler*, 527 U.S. at 290. And, after thoroughly reviewing the entire record of this case, the Court concludes that the same must be said for Claim 51 (cumulative IAC effect). No "globally fatal" error was committed here. As the state habeas judge's adopted order aptly concludes, "[t]here are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." Doc. 15-22 at 18 (quoting *Strickland*, 466 U.S. at 689); *see also Cullen*, 131 S. Ct. at 1403.

### G. Bernadette Davy

In Claim 50 Fortson cites the testimony of prosecution witness and GBI ballistic expert Bernadette Davy that the bullet recovered from Benton's head was of the same class of bullet as the ".22 Stinger" found at Fortson's home. Doc. 1 at 33 ¶ 50; *see also* doc. 17-6 at 75-82 (Davy's trial testimony). Davy resigned from her position in 2009, Fortson says, "because she falsified a test report in a criminal case." *Id.*; *see also Roscoe v. State*, 286 Ga. 325, 325 (2009) ("[I]t had been discovered that Bernadette Davy, a firearms examiner for the State, had not been

performing the required number of ballistics tests in each of her cases, and she was terminated for this breach of protocol.").

Violating the pleading and claim-presentation standards set forth above,[21] Fortson does *not* argue, much less cite to, any evidence supporting a claim that Davy falsified anything during Fortson's *2004* trial. So Davy's downfall is simply not relevant to Fortson's *actual* claim here, raised in the balance of Claim 50, that Crecelius was ineffective for failing to fully exploit the services of expert witness Kelly Fite. To the extent this claim, otherwise deemed procedurally defaulted by the state habeas court, doc. 15-22 at 5, is premised on Davy, it must be denied on the merits (hence, it is not necessary decide whether Fortson has shown cause to overcome procedural default).

Fortson insists Crecelius was ineffective because he should have had Fite "examine the bullet from the body of the victim in order to rebut [Davy's testimony] that it was consistent with a Stinger .22 [i.e., Fortson's rifle's ammo]." Doc. 1 at 33-34. Fite testified at trial that the bullet that killed Benton did not come from either of the two guns that

---

[21] Fortson raised this claim in the state habeas court. *See* doc. 15-2 at 12; *see also* doc. 15-22 at 4 (state habeas court ruling acknowledging it); *id.* at 5 (deeming it procedurally defaulted and that petitioner showed no IAC-based cause to overcome it).

the police seized from Fortson's home.  Doc. 17-6 at 131.  Millions of guns, he concluded, could have fired the fatal shot.  *Id.* at 132-33.

Respondent has not responded to this claim.  Nevertheless it must be denied.  Fortson again violates the pleading-presentation standards by supplying no transcript cites.  More importantly, she points to no *evidence* (e.g., an affidavit from Fite) showing that Fite would have rebutted Davy's testimony in the manner she claims.  Nor does she even hint (but only implies, and thus speculates) that Davy "broke bad" in her case.  Finally, Fite testified that, based on his testing, Fortson's rifles "could not have fired" the fatal bullet.  *Id.* at 131.  Given that fairly powerful point, the Court is unable to discern what more Crecelius could or should have done.  So even assuming cause exists to overcome procedural default, this claim nevertheless also fails.

## IV. CONCLUSION

Tracy Lea Fortson's 28 U.S.C. § 2254 petition must be **DENIED**. Doc. 1.  Applying the Certificate of Appealability (COA) standards, which are set forth in *Brown v. United States*, 2009 WL 307872 at * 1-2 (S.D. Ga. Feb. 9, 2009) (unpublished), the Court discerns no COA-worthy issues at this stage of the litigation, so no COA should issue.  28 U.S.C. §

2253(c)(1); *see Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000) (approving sua sponte denial of COA before movant filed a notice of appeal). And, as there are no non-frivolous issues to raise on appeal, an appeal would not be taken in good faith. Thus, *in forma pauperis* status on appeal should likewise be **DENIED**. 28 U.S.C. § 1915(a)(3).

**SO REPORTED AND RECOMMENDED** this __6th__ day of October, 2011.

UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA